FIFTH DIVISION
March 4, 2011

No. 1-09-2847

| | | |
|---|---|---|
| JOSEPH ERWIN, JR., a Minor By His Mother, | ) | Appeal from the |
| and Next Friend, TINA ERWIN, and | ) | Circuit Court of |
| ANDREW GARRISON, a Minor, By His Mother | ) | Cook County, Illinois, |
| and Next Friend, LESLIE GARRISON, | ) | Law Division. |
| | ) | |
| Plaintiffs-Appellees, | ) | |
| | ) | No. 08 L 010824 |
| v. | ) | |
| | ) | |
| MOTOROLA, INC., | ) | Honorable |
| | ) | Elizabeth M. Budzinski |
| Defendant-Appellant. | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.

Justices Joseph Gordon and Howse concurred in the judgment and opinion.

## OPINION

The plaintiffs, Joseph Erwin Jr., a minor, by his mother and next friend, Tina Erwin, and Andrew Garrison, a minor, by his mother and next friend, Leslie Garrison, brought an action in the circuit court of Cook County against the defendant, Motorola, Inc. (hereinafter Motorola), alleging that they suffered birth defects as a result of their parents' exposure to certain hazardous chemicals (namely, ethylene glycol ethers) during their employment in Motorola's semiconductor industry "clean rooms" in Texas and Arizona.

Motorola moved to dismiss on the grounds of *forum non conveniens* in favor of an action in Travis County, Texas. The circuit court of Cook County denied Motorola's motion to dismiss the case in Illinois and transfer venue to Texas. Motorola then petitioned this court for leave to

1

No. 1-09-2847

appeal pursuant to Illinois Supreme Court Rule 306(a)(2) (eff. Sept. 1, 2006). On appeal, Motorola contends that the circuit court's order denying Motorola's request to dismiss the action in Illinois and transfer it to Texas should be reversed because the private and public interest factors used in *forum non conveniens* analysis strongly support the conclusion that the case should be tried in Texas, rather than Illinois. For the reasons that follow, we affirm the decision of the circuit court.

## I. BACKGROUND

We initially note that because this is an interlocutory appeal taken pursuant to Illinois Supreme Court Rule 306(a)(2) (eff. Sept. 1, 2006)[1] Motorola was required to attach a "supporting record" to its petition for leave to appeal (Ill. S. Ct. R. 306(c) (eff. Sept. 1, 2006)),[2] authenticated either by a certificate of the circuit court clerk or "by the affidavit of the attorney or party filing it" (see Ill. S. Ct. R. 328 (eff. Feb. 1, 1994).[3] In the case at bar, the supporting record

---

[1]See Ill. S. Ct. 306(a)(2) (eff. Sept. 1, 2006): "(a) *** A party may petition for leave to appeal to the Appellate Court from the following orders of the trial court: *** (2) from an order of the circuit court allowing or denying a motion to dismiss on the grounds of *forum non conveniens* ***."

[2]See Ill. S. Ct. R. 306(c) (eff. Sept. 1, 2006): "The petition shall contain a statement of the facts of the case, supported by reference to the *supporting record*, and of the grounds for the appeal." (Emphasis added.)

[3]See Ill. S. Ct. R. 328 (eff. Feb. 1, 1994): "Any party seeking relief from the reviewing court before the record on appeal is filed shall file with his or her application an appropriate

2

was authenticated by an attorney's affidavit.  After the petition for leave to appeal was granted, this court did not order Motorola to file a record, as permitted by Supreme Court Rule 306(h) (eff. Sept. 1, 2006); and no party to the appeal requested that additional portions of the record be prepared, as permitted by Supreme Court Rule 306(f) (Ill. S. Ct. 306(f) (eff. Sept. 1, 2006)). Accordingly, this appeal proceeded based solely on the supporting record filed by Motorola with its petition for leave to appeal.  That supporting record reveals the following pertinent facts and procedural history.

### A. The Plaintiffs' Complaint

On September 30, 2008, Tina Erwin and Leslie Garrison, the mothers of the two minor plaintiffs, Joseph Erwin, Jr., and Andrew Garrison, filed a three-count complaint in the circuit court of Cook County on behalf of their sons, alleging: (1) negligence (2) strict liability, and (3) willful and wanton misconduct against Motorola for the injuries allegedly sustained by their sons, *in utero*, as a result of their respective parents' exposure to defective, unsafe, and abnormally dangerous chemicals (including, but not limited to, ethylene glycol ethers) while working in the "clean rooms" of Motorola's semiconductor manufacturing plants.

The complaint alleged that from 1993 to 1998, Joseph Erwin, Jr.'s mother, Tina Erwin, worked in a "clean room," at Motorola's Phoenix, Arizona, semiconductor manufacturing facility, while his father, Joseph Erwin, Sr., worked at that same facility from 1992 to 2003.  Similarly, the

supporting record containing enough of the trial court record to show an appealable order or judgment ***.  The supporting record must be authenticated by the certificate of the clerk of the trial court or by the affidavit of the attorney or party filing it."

complaint alleged that Andrew Garrison's mother, Leslie Garrison, worked in a "clean room" at Motorola's Austin, Texas, semiconductor manufacturing facility from 1995 to 1998, while his father Thomas Garrison worked in the same facility from 1995 to 2002. Plaintiff Joseph Erwin, Jr., was born on September 5, 1997, while plaintiff Andrew Garrison was born on January 5, 1998. Both were born with serious and debilitating birth defects.

The complaint further alleged that since 1993, Motorola, from its headquarters in Schaumburg, Illinois, repeatedly approved the use of reproductively toxic compounds in "clean rooms," used in the manufacture and assembly of its semiconductor devices (such as computer "chips" "wafers" and "boards") at its various facilities, despite its knowledge of the defective, unsafe and unreasonably dangerous nature of such chemicals, and without any warning to its employees or any protective measures taken to ensure the safety of those employees. In addition, the complaint alleged that Motorola intentionally, willfully or with a reckless disregard for the safety of its employees ignored and concealed the health hazards posed by these chemicals and, in fact, made express and implied warranties and representations that the chemicals were safe.

The complaint specifically alleged that Motorola, from its headquarters in Illinois, knew of the dangers posed by these hazardous chemicals. According to the complaint, beginning in the late 1970s, the Semiconductor Industry Association, a trade organization for the entire semiconductor industry (hereinafter SIA) repeatedly advised its members, including Motorola,[4] of the reproductive hazards associated with occupational exposures to certain hazardous chemicals

---

[4]We note that as shall be demonstrated further below, Motorola admitted in its answer to the plaintiffs interrogatories that at all times relevant to this litigation it was a member of SIA.

used in the manufacture of semiconductor chips in "clean rooms." Second, in 1981 the California branch of the Occupational Safety and Health Administration (hereinafter OSHA) specifically issued warnings about the potential reproductive harms associated with exposures to ethylene glycol ethers, which, at that time, were being used pervasively in the semiconductor manufacturing process. Third, in that same time period, several chemical manufacturers and suppliers, including but not limited to Union Carbide Corporation, repeatedly issued warnings to their customers in the semiconductor industry, including Motorola, of the risks of birth defects associated with exposure to ethylene glycol ethers used in "clean rooms." Fourth, in 1981 Bryan Hardin, an official of the National Institute of OSHA personally warned corporate health and safety representatives of the semiconductor industry, including those in Motorola, of the reproductive hazards of ethylene glycol ethers. Fifth, in the mid 1980s, with the knowledge, support and funding of the semiconductor industry, including Motorola, the SIA undertook a comprehensive study investigating the reproductive hazards of working in the semiconductor industry, documenting (both in the interim reports and the final report published in1992) an increased risk of birth defects to semiconductor workers exposed to ethylene glycol ethers.[5] Sixth, in 1998, a well publicized epidemiology study of semiconductor manufacturing workers

---

[5]We note that, as shall be demonstrated further below, Motorola admitted in its answer to the plaintiffs' interrogatories to having funded this SIA study. The study was conducted at the University of California, Davis, and the results were published in an article entitled "Epidemiologic Study of Reproductive and Other Health Effects Among Workers Employed in the Manufacture of Semiconductors."

was published documenting a statistically significant increase in the incidence of adverse reproductive outcomes of workers exposed to chemicals used in the manufacture of semiconductor chips. Seventh, in 1984, chemical manufacturer Hoechst Celanese undertook to develop less reproductively toxic process chemicals to be substituted in the manufacturing process of semiconductor chips and beginning in 1985 actively promoted and marketed these products as a safer alternative to the semiconductor industry, including Motorola. Eight, in 1986, the semiconductor manufacturer International Business Machines (IBM), through the Johns Hopkins University, initiated an extensive and well-publicized retrospective and prospective epidemiological study involving hundreds of its semiconductor manufacturing workers, further documenting the serious reproductive harms resulting from occupational exposures to chemicals in the semiconductor manufacturing plants.[6]

The complaint further alleged that despite this knowledge, from its headquarters in Schaumburg, Illinois, Motorola maintained the use of its "clean rooms," knowing that they were built without ventilation systems that could protect the workers from inhalation or skin exposure to any liquids, vapors, gases or fumes arising from the hazardous chemicals. In addition, the complaint alleged that any "protective" gear worn by the workers in the "clean rooms" was configured solely for the protection of the manufactured computer "chips," rather than for the protection of the workers. Based upon the aforementioned, the plaintiffs contended that their *in utero* exposure to the hazardous chemicals while their parents were working in Motorola's "clean rooms" caused their birth defects.

---

[6]We note that copies of all relevant reports are part of the record below.

### B. Motorola's Motion to Dismiss and Limited Discovery

After the plaintiffs filed their complaint, on November 7, 2008, Motorola moved to dismiss the case on the basis of *forum non conveniens,* contending that Illinois was an inconvenient forum and that instead the case should be transferred to Travis County, Texas. The circuit court subsequently permitted limited discovery solely for the purpose of determining the appropriateness of Cook County, Illinois, as the proper forum for the plaintiffs' action. In the course of that somewhat cumbersome and hotly contested discovery process, during which the parties reluctantly exchanged answers to interrogatories, document requests, and affidavits, as well as deposed two witnesses, the following information was disclosed to the circuit court.

The parties agreed that at all relevant times to this litigation, Motorola maintained and continues to maintain its headquarters in Schaumburg, Illinois. It was further agreed that none of the plaintiffs ever resided or worked in Illinois, nor currently reside or work in this state.[7] Rather, plaintiff Joseph Erwin, Jr., and his parents resided, worked and continue to reside and work in Phoenix, Arizona, while plaintiff Andrew Garrison and his parents, resided, worked and continued to reside and work in Austin, Texas. It was further undisputed that neither of the plaintiffs nor any of their parents were ever treated for their injuries in Illinois; rather plaintiff Garrison and his parents had been treated by doctors and hospitals exclusively in Texas, while plaintiff Erwin, Jr., and his parents had sought treatment in both Arizona and Texas.[8]

---

[7]We note, however, that all of the plaintiffs stated that it would be convenient for them to try the case in Illinois.

[8]We note, however, that the plaintiffs divulged in several of their discovery documents that

7

During the *forum non conveniens* discovery, the parties hotly disputed whether it was local personnel at Motorola's Texas and Arizona facilities, or corporate personnel at Motorola's headquarters in Illinois, who were responsible for generating, implementing and overseeing environmental health and safety protocols in Motorola's "clean rooms." The following contested facts were presented to the trial court. Through an affidavit, Joseph Erwin, Sr., the plaintiff Joseph Erwin, Jr.'s father, stated that from 1992 to 2000 he worked at Motorola's Phoenix, Arizona, semiconductor fabrication facility, first as an operator, then as a production supervisor, and finally a master production analyst. Erwin was subsequently transferred to Motorola's Austin, Texas, semiconductor fabrication facility where he worked as an information technology project manager until 2003. Erwin testified that while he was employed at Motorola's Phoenix and Austin facilities, senior mangers and operational managers frequently traveled to Motorola's corporate headquarters in Schaumburg, Illinois, to discuss management, operations, and planning. According to Erwin, "the basic procedures for manufacturing the semiconductor chips, were developed in Schaumburg, Illinois." In addition, all protocols and information regarding employee safety came from Motorola in Schaumburg. Erwin also averred that it would not be inconvenient for him to travel to Cook County, Illinois.

Next, in her affidavit, Leslie Garrison, the mother of plaintiff Andrew Garrison, stated that from 1995 to 1998 she worked in the assembly line of Motorola's Austin, Texas semiconductor manufacturing plant. According to Garrison, while she worked in the Austin plant, from time to

---

all of their, and their parents', medical records are currently in the possession of their attorneys in Chicago, Illinois.

time, Motorola employees who reported directly to Motorola's corporate headquarters near Chicago would come to the Austin plant to perform air testing in the semiconductor facilities.[9] She and her coworkers at the Austin facility were never told the results of these tests, nor were they warned about the dangers of ethylene glycol ethers present in the facility.

In addition, in his affidavit, David Manning, Sr., testified that he worked for Motorola from 1969 to 1998 (with the exception of four years between 1974 to 1978). Manning initially worked at Motorola's Phoenix, Arizona, facility, but then in 1978 moved to Austin, Texas, to work at Motorola's recently constructed semiconductor fabrication facility. Manning averred that given his 26 ½ years of experience working for Motorola he is "very familiar with [Motorola's] corporate structure, and decision making process." Manning testified that Motorola's headquarters in Schaumburg was "solely and directly" responsible for policy, decisions and precautions regarding health, and safety, industrial hygiene and OSHA compliance. According to Manning, the individual facilities in Austin and Phoenix did not have health and safety personnel with independence to act outside of Motorola headquarters' protocol.

Manning further averred that while he worked at Motorola's Phoenix and Arizona semiconductor facilities, Motorola outside employees, who reported directly to Motorola's headquarters in Schaumburg, would test air quality samples and ensure compliance with company and, ostensibly, OSHA safety regulations. According to Manning, the employees at the Austin and Phoenix plants were never informed of the dangers of ethylene glycol ethers, nor were they

___

[9]As shall be demonstrated below, this statement was corroborated by the affidavit of David Manning, Sr.

advised to take precautions because the ethers could cause birth defects in the exposed employees' children.

On the other hand, in his affidavit, Alex Pepe testified that he is currently the senior vice president of supply chain organization at Freescale Semiconductor, Inc. (hereinafter Freescale), and a former managerial employee of Motorola's semiconductor products sector (hereinafter Motorola SPS). Pepe stated that in 2004, Motorola "spun off" its Semiconductor Products Sector into Freescale, an independent corporation registered in the state of Delaware. Freescale currently owns the manufacturing facilities in Phoenix, Arizona, and Austin, Texas.

According to Pepe, although prior to 2004 Motorola's headquarters was in Schaumburg, Illinois, its semiconductor division, Motorola SPS, operated like an "independent company," first headquartered in Phoenix, Arizona, until 1997, and then in Austin, Texas, from 1997 to 2004. Pepe stated that the policies and procedures governing the specific chemicals used at Motorola's semiconductor manufacturing facilities were "generally not developed out of Motorola's Schaumburg headquarters." Rather, Motorola SPS was, "in large part," responsible for developing the policies and procedures regarding the design and manufacture of semiconductors, including any chemicals used in the manufacturing processes. Pepe stated that specific decisions regarding the compounds used at a particular manufacturing facility were "generally" made by environmental and health and safety personnel and its design engineers, "most of whom" were located either in Austin or Phoenix.

Pepe further testified that "almost all" of the safety and maintenance records, "if any," relating to "clean rooms" in Motorola SPS's Austin and Phoenix facilities, now owned by

Freescale, would be located in either Phoenix or Austin, respectively. Pepe finally averred that "all witnesses" material to the plaintiffs' claims, including "managers, supervisors, coworkers and Motorola SPS's environmental health and safety personnel, to the extent they are still employed by Freescale," reside either in Arizona or Texas.

During discovery, Motorola also offered the affidavit of Asanga Weerakoon. In that affidavit, Weerakoon averred she is presently the director of environmental health and safety at Freescale, but that from 1989 to 2004 she worked for Motorola in a variety of engineering and management positions. Weerakoon stated that she does not personally know either David Manning or Joseph Erwin, Sr., but that it was her belief that neither of the two held a management position at Motorola and that therefore neither would have personal knowledge as to why Motorola corporate employees were at a certain facility.

According to Weerakoon, Motorola SPS facilities in Phoenix and Austin had, and under Freescale continue to have, trained environmental, health and safety professionals. Prior to Freescale's purchase of Motorola SPS, decisions regarding health, safety, industrial hygiene and OSHA compliance were made at the Motorola SPS Phoenix and Austin facilities and not in Schaumburg, Illinois. Specifically, according to Weerakoon, on-site personnel from Motorola SPS and not individuals from Schaumburg, Illinois, conducted air monitoring in the Phoenix and Austin facilities. Motorola SPS was not required to provide the results of such testing to corporate headquarters in Schaumburg, Illinois. In addition, Weerakoon testified that the results of air monitoring were routinely made available to the employees in accordance with OSHA regulations, through local meetings.

As part of the *forum non conveniens* discovery, the deposition of Jodi Shapiro was taken on April 16, 2009, and the following relevant evidence was obtained. During that deposition, Shapiro, who resides in Arlington Heights, Illinois, stated that she has worked for Motorola for 19 years and that she is currently the vice president of environmental health and safety (a position within Motorola's law department, which is and has exclusively been located in Schaumburg, Illinois).

Shapiro next testified that between 2001 and 2005, Motorola's general corporate environmental health and safety standards were issued by Motorola's steering and executive committees, with the help of Motorola's government relations office, which was responsible for identifying, reviewing and implementing new government and agency studies and regulations as they related to Motorola's business. According to Shapiro, during this time period, Motorola regularly utilized a corporate-wide audit program, performed by Motorola's environmental health and safety professionals, who directly reported to the audit manager in Schaumburg, Illinois. That audit manager in turn reported to Shapiro. Moreover, Shapiro admitted that Motorola's corporate environmental health and safety audit program was in place at Motorola long before 2001.[10]

During her deposition, Shapiro initially and repeatedly stated that she was unable to describe Motorola's corporate structure in the 1990s, because "back then" Motorola was "decentralized." However, she later explained that in the 1990s, Motorola was composed of

---

[10]Shapiro also stated that apart from these corporate-wide environmental health and safety audits, each site also performed its own self-audit.

three business sectors: (1) the land mobile products sector; (2) the cellular infrastructure group; and (3) the cell phone division. Shapiro further acknowledged that in the 1990s, Motorola's steering committee headquartered in Schaumburg, Illinois, was charged with determining all environmental, health and safety regulations and standards. The steering committee was composed of senior members selected from the three business sectors, and Shapiro, herself, was a member. The steering committee's environmental health and safety standards were then approved by Motorola's executive committee, also headquartered in Schaumburg, before being implemented by the local business sectors. According to Shapiro, each business sector would implement the corporate-wide environmental health and safety goals and regulations by passing them down the chain of command to environmental health and safety personnel in Motorola's local facilities within that particular sector.

Shapiro acknowledged that she was on the steering committee the first time an issue concerning potential birth defects caused by chemicals used at Motorola's semiconductor manufacturing facilities was raised. She stated that she was first alerted to the issue sometime in the 1990s after a memo was issued regarding the possibility of such birth defects.

During discovery, the deposition of Michael Loch was held on April 21, 2009. Loch stated that he is the director of environmental health and safety at Motorola in Schaumburg, Illinois, and that he directly reports to Jody Shapiro. Loch has worked for Motorola since 1986 and now lives in Cary, Illinois.

Loch's testimony regarding Motorola's environmental health and safety program in the 1990s mirrored that of Shapiro. According to Loch, in the 1990s, Motorola's corporate

13

environmental standards were developed by environmental health and safety professionals and experts from Motorola's various operations and facilities from around the world. These standards were then refined and approved by Motorola's steering and then executive committees, in Schaumburg, Illinois, and released by the corporate environmental offices to Motorola's three business sectors. Because, according to Loch, in the 1990s the business sectors were more autonomous, Motorola created an environmental health and safety council, composed of regional environmental health and safety personnel, who would hold council meetings to communicate the corporate health and safety standards to the local facilities within their business sector. Loch was on the environmental health and safety council in the 1990s, as well as on the steering committee.

Loch admitted that he first became aware of the dangers of ethylene glycol ethers some time in the first five years of his employment with Motorola, between 1986 and 1991 when a memo was sent around to all Motorola facilities regarding the use of such ethers in the semiconductor manufacturing program and instructing employees that the substances were not to be used any longer. Loch, however, could not recall the exact date of the memo.

Loch next acknowledged that in the time period relevant to the present litigation, Motorola owned and operated two "clean rooms" in Illinois, one in Northbrook and one in Schaumburg. This statement was corroborated by Motorola's answer to the plaintiffs' interrogatories wherein Motorola admitted that between1992 and 1995 it owned and operated several facilities throughout the country that contained "clean rooms," including: three facilities in Schaumburg, Illinois, one facility in Northbrook, Illinois, one facility in Arlington Heights, Illinois, one facility in Chandler, Arizona, one facility in Elma, New York, one facility in Scottsdale,

14

Arizona, and two facilities in Tempe, Arizona.[11]

Apart from the testimonial evidence offered by the aforementioned affidavits and depositions, during the *forum non conveniens* discovery, the parties were asked to identify the witnesses they intended to call at trial. While Motorola did not name a single witness it intended to call at trial, the plaintiffs identified over 50 potential witnesses, a large majority of whom reside in Illinois. Apart from the plaintiffs' parents Joseph Erwin, Sr., Leslie Garrison, and the occurrence witness, David Manning, none of whom reside in Illinois, but all of whom attested that it would not be inconvenient for them to litigate the case in Illinois, the plaintiffs identified 16 witnesses from within Motorola's corporate structure whom they intended to call as potential liability witnesses at trial. Twleve of these witnesses currently reside in Illinois, including: (1) Greg Brown (president and chief executive officer (CEO) of Motorola's broadband mobility solutions); (2) Sanjay Jha (CEO of Motorola's mobile devices); (3) Peter Lawson (executive vice president, general counsel and secretary of Motorola); (4) Bob Perez (senior vice president of Motorola's integrated supply chain); (5) Karen Tandy (senior vice president of public affairs and communications); (6) Leslie Jones (senior vice president and chief information officer); (7) Greg Lee (senior vice president of human resources); (8) Chris Galvin (Motorola's CEO from 1995-2003, and general manger of Tegal Semiconductor, a subsidiary of Motorola from 1984 to 1990); (9) Keith Bane (director of strategy, technology and external relations in the 1990s); (10) William

---

[11]We note that in addition, a document provided by Motorola entitled "Motorola SPS Fab Dates" lists semiconductor manufacturing facilities with "clean rooms" in several other countries as well, including France, Scotland, China, Malaysia, Korea, and Japan.

Hoffman III (principal staff engineer at Motorola Labs, and author of "Material Reporting and Test Methods at Motorola Labs") (2005)); (11) Roger Bertelson (former Motorola corporate vice president of environmental affairs, who was identified in Motorola's answer to the plaintiffs' interrogatories as one of three men responsible for promulgating and overseeing Motorola's environmental health and safety program between 1995 and 1998, and a member of both the steering and executive committees in the 1990s); and (12) Robert Galvin (Motorola's CEO between 1959 and 1986, and former member of the board of directors of SIA). The remaining four witnesses reside outside Illinois, but also outside Motorola's sought-out venue, Texas: (1) James A. Norling (who was general manager of Motorola SPS from 1986 to 1993), currently in Arizona; (2) Hector de J. Ruiz (executive vice president of Motorola in 1997), currently in California; (3) Gary Tooker (Motorola's CEO from 1993 to 1995, former head of Motorola's semiconductor division and chairman of the board of directors at SIA since 1985), currently in Arizona; and (4) Richard Guimond (former Motorola corporate vice president of environmental affairs, who, just as Robert Bertelson, was identified in Motorola's answer to the plaintiffs' interrogatories as one of three men responsible for promulgating and overseeing Motorola's environmental health and safety program between 1995 and 1998, and as a member of both the steering and executive committees in the 1990s), currently either in Connecticut or Florida. The plaintiffs specifically alleged that three of the aforementioned current and/or former Motorola corporate leaders, Chris Galvin, Robert Galvin and Gary Tooker, had specific knowledge of the dangers of ethylene glycol ethers in the 1990s, through their association with the SIA, but

permitted its continued use in Motorola's "clean rooms."[12]

The plaintiffs further identified as potential witnesses 41 individuals who were members of Motorola's steering and executive committees in the 1990s; 27 of these witnesses currently reside in Illinois, and none reside in Texas.

The plaintiffs further provided a list of 13 potential expert witnesses who would testify about different facets of the semiconductor industry, including technical development, manufacturing, toxicology and health and safety, and who had previously testified in a similar semiconductor worker birth defect litigation against IBM in New York. These individuals reside in nine different states, none of which is either Illinois or Texas. In addition, the plaintiffs provided a list of 28 potential expert medical witnesses, none of whom reside in either Illinois or Texas, but who are, rather, scattered throughout the country, in: Maryland, New York, Kansas, New Hampshire, California, Colorado, North Carolina, Washington, D.C., Massachusetts, Vermont, Pennsylvania, and Idaho.

After discovery was completed, the parties briefed the *forum non conveniens* issue for the circuit court. After reviewing the arguments of the parties, on September 22, 2009, the circuit court, in a written order, denied Motorola's motion to dismiss on the basis of *forum non conveniens* and found that Cook County, Illinois, was a proper forum for the cause. Pursuant to Illinois Supreme Court Rule 306(a)(2) (eff. Sept. 1, 2006), this court granted Motorola's petition for leave to appeal that ruling.

---

[12] As noted above, Robert Galvin and Chris Galvin both reside in Illinois, while Gary Tooker resides in Arizona.

## II. ANALYSIS

On appeal, Motorola contends that the circuit court's order denying Motorola's request to dismiss the action in Illinois and transfer it to Texas should be reversed because the private and public interest factors used in a *forum non conveniens* analysis strongly support the conclusion that the case should be tried in Texas, rather than Illinois. Motorola specifically contends that the circuit court erred by permitting the case to proceed in Illinois because it: (1) improperly and solely focused on the fact that Motorola's headquarters is located in Schaumburg, Illinois; (2) provided Motorola with no means by which to compel key out-of-state witnesses to testify in its defense in Illinois; and (3) applied the wrong standard in analyzing the public interest factors by failing to consider that Illinois had no real connection to the present litigation and by imposing on the Illinois court the heavy burden of having to apply foreign substantive law. For the reasons that follow, we disagree.

We begin our analysis by setting forth the well-established principles regarding *forum non conveniens*. The *forum non conveniens* doctrine is an equitable doctrine grounded on considerations of " 'fundamental fairness and sensible and effective judicial administration,' " which permits the circuit court to decline jurisdiction in the exceptional case where a trial in another forum with proper jurisdiction and venue would better serve the ends of justice. *First American Bank v. Guerine*, 198 Ill. 2d 511, 515 (2002) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1947)); see also *Dawdy v. Union Pacific R.R. Co.*, 207 Ill. 2d 167, 171 (2003); *Langenhorst v. Norfolk Southern Ry. Co.*, 219 Ill. 2d 430, 441-42 (2006).[13] The decision to grant

---

[13]We note that a defendant may invoke the doctrine of *forum non conveniens* to transfer

or deny a motion to dismiss based on the doctrine of *forum non conveniens* lies within the sound discretion of the trial court. *Langenhorst,* 219 Ill. 2d at 441-42. Accordingly, a reviewing court will uphold the trial court's determination on such a motion unless no reasonable person would adopt the view taken by the trial court. *Langenhorst*, 219 Ill. 2d at 442; see also *Vivas v. Boeing Co.*, 392 Ill. App. 3d 644, 657 (2009) ("[t]he issue *** is not what decision [the reviewing court] would have reached if [it] were reviewing the facts on a clean slate, but whether the trial court acted in a way that no reasonable person would"). Our supreme court has repeatedly noted that the circuit court should exercise its discretionary power to dismiss "only in *exceptional* circumstances when the interests of justice require a trial in a more convenient forum." (Emphasis in original and omitted.) *Langenhorst*, 219 Ill. 2d at 442.

In determining whether *forum non conveniens* applies, the trial court must balance private interest factors affecting the convenience of the litigants and public interest factors affecting the administration of the courts. *Langenhorst*, 219 Ill. 2d at 442. Relevant private factors include: " '(1) the convenience of the parties; (2) the relative ease of access to sources of testimonial, documentary, and real evidence; and (3) all other practical problems that make trial of a case easy, expeditious, and inexpensive.' " *Langenhorst*, 219 Ill. 2d at 443 (quoting *Guerine*, 198 Ill. 2d at

_____

an action from one county in Illinois to another Illinois county (intrastate transfer), or, as in this case, to transfer an action from a county in Illinois to a county in a different state (interstate transfer). *Dawdy*, 207 Ill. 2d at 176; *Peile v. Skelgas, Inc.*, 163 Ill. 2d 323, 335 (1994). Our supreme court has noted that "[t]he same considerations of convenience and fairness" apply in deciding the motion in either setting. *Dawdy*, 207 Ill. 2d at 176.

19

516). Relevant public interest factors include: "(1) the interest in deciding controversies locally; (2) the unfairness of imposing trial expense and the burden of jury duty on residents of a forum that has little connection to the litigation; and (3) the administrative difficulties presented by adding litigation to already congested court dockets." *Langenhorst*, 219 Ill. 2d at 443-44.

In balancing the private and public interest factors, no single factor is controlling. See *Langenhorst*, 219 Ill. 2d at 443 ("In deciding a *forum non conveniens* motion, a court must consider all of the relevant factors, without emphasizing any one factor."). Moreover, the trial court should not balance the private interest factors against the public interest factors; rather it should evaluate the totality of circumstances of the case in order to determine whether the balance of all factors "strongly favors" transfer. *Langenhorst*, 219 Ill. 2d at 444; see also *Gridley v. State Farm Mutual Automobile Insurance Co.*, 217 Ill. 2d 158, 169-70 (2005) see also *Lambert v. Goodyear Tire & Rubber Co.*, 332 Ill. App. 3d 373, 378-79 (2002).

In addition to balancing the private and public interest factors, the court must also consider its deference to the plaintiff's choice of forum. *Dawdy*, 207 Ill. 2d at 173. Generally, a plaintiff's right to select a forum is "substantial" and unless the factors weigh "strongly" in favor of dismissal, the plaintiff's choice of forum should "rarely" be disturbed. *Dawdy*, 207 Ill. 2d at 173; see also *Guerine*, 198 Ill. 2d at 521 (recognizing that "the battle over forum begins with plaintiff's choice already in the lead"). However, courts have recognized that where the plaintiff's chosen forum is neither his or her residence, nor the location in which the cause of action arose, the plaintiff's choice is entitled to less deference. *Langenhorst*, 219 Ill. 2d at 448; *Dawdy*, 207 Ill. 2d at 173-74. Nevertheless, our supreme court has cautioned that in such

circumstances " 'the deference to be accorded is only *less*, as opposed to *none*.' " (Emphases in original.) *Guerine*, 198 Ill. 2d at 518 (quoting *Elling v. State Farm Mutual Automobile Insurance Co.*, 291 Ill. App.3d 311, 318 (1997)). More importantly, throughout the proceedings, the burden remains on the party seeking dismissal to establish that the relevant factors "strongly favor" transfer. (Emphasis omitted.) *Langenhorst*, 219 Ill. 2d at 444 (quoting *Griffith v. Mitsubishi Aircraft International, Inc.*, 136 Ill. 2d 101, 108 (1990)).

With these principles in mind, we consider the relevant factors as they apply to the facts of this case.

## A. Private Interest Factors

First, with respect to the private interest factors, we take into account the deference owed to the plaintiffs' chosen forum and the convenience of the parties. We initially note that, since the plaintiffs, here, are not residents of Illinois, the circuit court properly afforded the plaintiffs chosen forum some, albeit limited, deference. See, *e.g.*, *Vivas*, 392 Ill. App. 3d at 658 (recognizing that trial court properly afforded "some deference" to the plaintiffs' chosen forum in Illinois, even though the plaintiffs were all Peruvian, and the airplane crash which allegedly caused the plaintiffs' injuries occurred in Peru); see also *Guerine*, 198 Ill. 2d at 518 (where the plaintiff chooses a foreign forum " 'the deference to be accorded [to his or her choice of forum] is only *less*, as opposed to *none*' " (emphases in original)), quoting *Elling*, 291 Ill. App.3d at 318.

In addition, the record reveals that the convenience of the parties did not weigh in favor of transfer to Texas. With respect to this factor, the defendant bears the burden in establishing that "plaintiff's chosen forum is inconvenient to the defendant." *Langenhorst*, 219 Ill. 2d at 450; see

also *Vivas*, 392 Ill. App. 3d at 658. Even where, as here, all of the plaintiffs reside outside their chosen forum, the " 'defendant cannot assert that the plaintiff[s'] chosen forum is inconvenient to the plaintiff[s].' [Citation.]" *Langenhorst*, 219 Ill. 2d at 448. In the present case, Motorola is a resident of Illinois and maintains its corporate headquarters in Illinois. In addition, according to Shapiro's discovery deposition, Motorola's entire legal department is located in Schaumburg, Illinois. While Motorola is correct in asserting that a party's principal place of business may not be dispositive in the *forum non conveniens* analysis, it certainly is an acceptable factor to be weighed in determining whether Illinois is an inconvenient forum. See, *e.g.*, *Gridley v. State Farm Mutual Automobile Insurance Co.*, 217 Ill. 2d 158, 173 (2005) ("the fact that [defendant's] principal place of business is in Illinois, then, is just one factor to be considered in determining whether Illinois or [another state] is the more appropriate forum"); see also *Dawdy*, 207 Ill. 2d at 182. Accordingly, the trial court was within its discretion when it noted that under these circumstances, Motorola could not genuinely contend that litigating the case in Illinois, where it maintained its corporate headquarters, would prove inconvenient to it. See *Vivas*, 392 Ill. App. 3d at 658 (holding that with respect to the convenience of the parties factor, the defendant, Boeing, could not contend that Cook County was an inconvenient forum since its corporate headquarters was in Chicago, even though the situs of the injury and all of the plaintiffs were in Peru).

Next, with respect to the second private interest factor, Motorola has failed to establish that the relative ease of access to sources of testimonial, documentary and real evidence weighs strongly in favor of a dismissal in Illinois and a transfer to Texas. Motorola first argues, as it did

below, that most of the testimonial evidence regarding the plaintiffs' exposure to the hazardous chemicals and any potential damages suffered by the plaintiffs will be found in Texas. Specifically, Motorola contends that almost all of the relevant third-party occurrence witnesses (including plaintiffs' former coworkers, managers and on-site environmental health and safety supervisors, who now work for Freescale, and not Motorola), as well as all of the plaintiffs' treating physicians, will be found in either Texas or Arizona and that, as such, they will be outside the reach of Illinois's compulsory process.[14]

While we agree with Motorola that Illinois courts would not have subpoena power in

---

[14]We note that in certain portions of its appellate brief, Motorola's argument with respect to its inability to reach key witnesses through the compulsory process is phrased in terms of a "deprivation of [Motorola's] fundamental right to due process of law." However, Motorola did not argue that it was deprived of due process of law before the trial court. See *Vine Street Clinic v. Healthlink, Inc.*, 222 Ill. 2d 276, 301 (2006) (an argument not raised in the trial court may not be raised for the first time on appeal). Moreover, Motorola nowhere, now, in its appellate brief attempts to develop this argument in terms of due process analysis, nor does it cite to any authority to support its position that its inability to subpoena witnesses in Texas or Arizona would constitute a deprivation of its right to due process of law. Ill. S. Ct. 341(h)(7) (eff. Sept. 1, 2006) (a point raised in a brief but not supported by citation to relevant authority fails to satisfy the requirements of Supreme Court Rule 347(h) and is forfeited). Accordingly, under these circumstances, we shall consider Motorola's arguments regarding Illinois's subpoena power, or lack thereof, only in the context of a *forum non conveniens* analysis.

either Texas or Arizona over any witnesses residing in those two states, and that this would undeniably affect the ability of Motorola to secure the attendance of unwilling witnesses to the compulsory process, we initially note that Motorola has failed to specify a single witness in either Texas or Arizona who would be unwilling to testify in Illinois. In fact, Motorola has not provided the name, or address, of a single witness it intends to call at trial, nor for that matter, what, if any, relevant testimony those witnesses might provide. Since the burden of proof lies with Motorola, under these circumstances, we are not at liberty to speculate about a witnesses' whereabouts or unwillingness to testify at trial. See, *e.g.*, *Cradle Society v. Adopt America Network*, 389 Ill. App. 3d 73, 76 (2009) (after recognizing that many of the defendant's potential witnesses may potentially reside in Ohio, thereby precluding the Illinois court from having subpoena power over them, the court refused to speculate about a witness's whereabouts or unwillingness since the defendant had failed to meet its burden of proof by failing to identify a specific witness who would be unwilling to testify in Illinois); see also *Brant v. Rosen*, 373 Ill. App. 3d 720, 728 (2007) (trial court was not free to speculate about the possible unwillingness of unnamed witnesses who would have to travel from Missouri to Illinois to testify at trial); *Ferguson v. Bill Berger Associates, Inc.*, 302 Ill. App. 3d 61, 72-73 (1998) (the court is not required to speculate about the current whereabouts of witnesses or their unwillingness to testify in a different state); *Hulsey v. Scheidt*, 258 Ill. App. 3d 567, 577 (1994) (where parties have not yet identified their witnesses, the court should not engage in speculation as to their travel to testify); see also *Brown v. Cottrell, Inc.*, 374 Ill. App. 3d 525, 533 (2007) (disregarding witnesses when proponents failed to specify what the subject of their testimony would be).

Nevertheless, even if we were at liberty to speculate, we would agree with the trial court that transfer to Texas would not solve the problem of securing the testimony of witnesses unwilling to subject themselves to the compulsory process. Although Motorola is correct in asserting that Texas would have no problem in obtaining the attendance of Motorola's Illinois employees, as they are party witnesses in this cause, the record reveals that at least half of the third-party occurrence witnesses who, Motorola alleges, will be relevant to its defense (namely, "former coworkers, managers and on-site environmental health and safety supervisors," as well as the plaintiffs' treating physicians), will necessarily reside in Arizona and will not be subject to Texas's subpoena powers. The record is clear that plaintiff Erwin's parents worked in Motorola's semiconductor facility in Phoenix, Arizona, and not in Texas. Moreover, while Erwin and his parents were treated and hospitalized in Texas, they also received medical treatment in Arizona, where Erwin was born. Accordingly, Texas, just like Illinois, will have no subpoena power over any third-party occurrence or treating physician witnesses from Arizona. Where the transfer to some other forum does not solve the compulsory attendance problem, the compulsory process factor is regarded as being neutral, and not strongly favoring transfer. See *Ellis v. AAR Parts Trading, Inc.*, 357 Ill. App. 3d 723, 743-44 (2005) ("As the court stated in its memorandum order, compulsory process of unwilling witnesses weighs equally against Cook County, Illinois, and the Philippines. If the case remains in Illinois, witnesses in the Philippines are not compelled to come to the United States; and, if the forum is changed to the Philippines, Illinois witnesses, including the plaintiff, could not be compelled to appear in the Philippines."); see also *Woodward v. Bridgestone/Fireston, Inc.*, 368 Ill. App. 3d 827, 835 (2006) ("The

25

compulsory process of unwilling witnesses weighs equally against Macon County, Illinois, and Australia. [Citation.] If the case remains in Illinois, witnesses in Australia are not compelled to come to the United States; and if the forum is changed to Australia, American witnesses are not compelled to appear in Australia."); see also *Vivas*, 392 Ill. App. 3d at 659 (finding that the compulsory process of unwilling witnesses and the cost of obtaining the attendance of willing witnesses did not weigh strongly in favor of dismissal and transfer to Peru, because even though Peruvian witnesses could not be compelled to testify in Illinois, correspondingly, American witnesses could not be compelled to testify in Peru).

More importantly, the record reveals that, unlike Motorola, which failed to specify its third-party occurrence witnesses, the plaintiffs provided the circuit court with an exhaustive list of liability witnesses they intended to call at trial, *i.e.*, Motorola's current and former corporate leaders, most of whom reside in Illinois, and none of whom reside in Texas. The plaintiffs specifically alleged that three of these witnesses had specific knowledge of the dangers of ethylene glycol ethers through their association with the SIA in the 1990s: Chris Galvin, Robert Galvin and Gary Tooker. Two of these former Motorola CEOs, Chris and Robert Galvin, reside in Illinois, while the third, Gary Tooker, resides in Arizona. Being a former and not current employee of Motorola, and a resident of Arizona, Tooker would not be subject to either Illinois's or Texas's compulsory witness process. The plaintiffs also identified by name 16 other Motorola corporate officers (12 of whom reside in Illinois), as well as 41 of Motorola's former steering and executive committee members (27 of whom reside in Illinois, and none of whom reside in Texas), whom they allege were directly responsible for generating environmental health and safety policies

permitting the use of ethylene glycol ether in Motorola's "clean rooms."

Motorola contends that these witnesses are irrelevant and should not be considered in the *forum non conveniens* context because the plaintiffs have failed to show a direct connection between Motorola's corporate headquarters and the local decision by Motorola SPS personnel in Arizona and Texas to use ethylene glycol ethers at Motorola's semiconductor manufacturing facilities in those two states. We disagree.

In reviewing the relevance of these witnesses, the trial court specifically recognized that the parties had presented competing evidence with respect to who was responsible for making decisions regarding environmental health and safety decisions at Motorola's semiconductor plants, whether corporate personnel in Cook County or local personnel at the Phoenix, Arizona, and Austin, Texas, facilities. The trial court further found that such a determination would "have to be fleshed out through [full] discovery and may require a trier of fact to determine credibility issues." Accordingly, the trial court rejected Motorola's contention that personnel from Motorola's local Phoenix and Austin plants, yet to be identified by Motorola, would be the only relevant witnesses rather than the named personnel from Motorola's corporate headquarters in Schaumburg, Illinois. After reviewing the conflicting affidavits of Pepe, Weerakoon, Erwin Sr., Manning, and Leslie Garrison, as well as the deposition testimony of Shapiro and Loch, we find no abuse of discretion in this determination by the trial court. See, *e.g.*, *Ford v. Grizzle*, 398 Ill. App. 3d 639, 646 (2010) ("It is the function of the trial court to determine the admissibility and relevance of evidence, and its ruling will not be disturbed absent an abuse of discretion.").

After considering all of the proposed potential liability and third-party occurrence

witnesses (both those specifically identified and those generally named as a class of potential witnesses), the trial court found that the witnesses were not localized in either Illinois or Texas but, rather, were "scattered" throughout the United States, namely in Illinois, Texas and Arizona. In coming to this decision, the trial court further made note of the plaintiffs' 28 named expert medical witnesses, stating that none of them reside in Illinois or Texas, but would come from 12 different states, including: Maryland, New York, Kansas, New Hampshire, California, Colorado, North Carolina, Washington, D.C., Massachusetts, Vermont, Pennsylvania, and Idaho.[15] Accordingly, the trial court found that Motorola had failed in its burden to establish that the relative ease of obtaining such "scattered" testimonial evidence weighed strongly in favor of dismissal and transfer to Texas. Having reviewed the evidence before the circuit court, we find no abuse of discretion in this finding. See *Vivas*, 392 Ill. App. 3d at 659 (noting that it was not an abuse of discretion to conclude that where "witnesses *** [are] scattered among different states and countries," this factor did not tilt in favor of any one forum); *Woodward*, 368 Ill. App. 3d at 834, (where potential witnesses are "scattered among different forums," no one forum can be said to be more convenient); *Ellis*, 357 Ill. App. 3d at 747 (same); *Guerine*, 198 Ill. 2d at 526.

Motorola next contends that all of the documents relevant to its defense are located in

---

[15]We note that although the presence of expert witnesses is not accorded great significance as those witnesses are generally compensated and therefore inclined to testify wherever instructed, it is still a factor that may properly be considered by the trial court in determining the private interest factors. See *Cradle Society*, 389 Ill. App. 3d at 77; see also *Griffith v. Mitsubishi Aircraft International, Inc.*, 136 Ill. 2d 101, 112 (1990).

Texas, including: (1) the records relating to the chemicals used at the facilities where the plaintiffs were injured, and which are now owned and operated by Freescale, which has its principal place of business in Texas; and (2) the plaintiffs' hospital and medical records, crucial to whether the plaintiffs were actually exposed to any harmful chemical and suffered any injury. We disagree.

With respect to the plaintiffs' medical documents, we initially note that the record reveals that throughout discovery, the plaintiffs have repeatedly informed Motorola that all of their medical records (although originating in Texas and Arizona), are now in the possession of their attorneys in Chicago, such that Motorola should not experience any inconvenience in obtaining them. In addition, with respect to any records regarding the chemicals used at Motorola SPS facilities in Texas and Arizona, now owned by Freescale, we note that Motorola's own affiants, Pepe and Weerakoon, currently both Freescale environmental health and safety employees, and former Motorola SPS managers, could not state with certainty that any such documents actually exist. In fact, both stated that those documents, "if any," would presumably be in the hands of Freescale. More importantly, even if such records did exist and were located in Texas and/or Arizona, this factor alone would not weigh in favor of transfer to Texas, since it has become well-recognized by our courts that given our current state of technology (including e-mail, Internet, fax and copying machines) documentary evidence can be copied and transported easily and inexpensively. See, *e.g.*, *Vivas*, 392 Ill. App. 3d at 659 ("the location of documents, records and photographs has become a less significant factor in *forum non conveniens* analysis in the modern age of e-mail, Internet, telefax, copying machines and world-wide delivery services, since they can now be easily copied and sent"); see also *Woodward*, 368 Ill. App. 3d at 834 (noting that in

modern *forum non conveniens* analysis "the location of documents is not significant because documents can be transported with ease and at little expense"); see also *Hayes v. Fireman's Fund Mortgage Corp.*, 272 Ill. App. 3d 271, 278 (1995) (the location of documents is becoming an increasingly less significant factor in *forum non conveniens* analysis because documents can be transported with ease and at little expense); *Glass v. Dot Transportation, Inc.*, 393 Ill. App. 3d 829, 836-37 (2009) ("there should be little difficulty encountered in securing documentary evidence, given that current technology allows documents to be copied and transported easily and inexpensively"); see also *Ammerman v. Raymond Corp.*, 379 Ill. App. 3d 878, 890 (2008) (same).[16]

Lastly, we consider the "practical problems that make trial of a case easy, expeditious, and inexpensive." (Internal quotation marks omitted.) *Langenhorst*, 219 Ill. 2d at 443. In that respect, we note that both Motorola's and the plaintiff's chosen attorneys maintain offices in Cook County. Our supreme court has stated that while little weight should be accorded this factor, a court may still consider it in the *forum non conveniens* analysis. *Dawdy*, 207 Ill. 2d at

---

[16]With respect to the relative ease of obtaining real evidence, we note that we have disregarded the jury's potential need to view the alleged site of the injury (presumably the actual semiconductor manufacturing "clean rooms" where the plaintiffs were allegedly exposed to the hazardous chemicals) because the parties agreed before the circuit court that a jury visit is inappropriate (*Ferguson*, 302 Ill. App. 3d at 70; see also *Eads v. Consolidated Rail Corp.*, 365 Ill. App. 3d 19, 32 (2006)). Moreover, the record suggests that the facilities where the plaintiffs worked in the 1990s have been changed several times in the past 20 years.

179; see also *Langenhorst*, 219 Ill. 2d at 450 (recognizing that although "the location of the parties' attorneys is accorded little weight," when reviewing a motion to transfer, it may nonetheless be considered); *Guerine*, 198 Ill. 2d at 524 (same); see also, *e.g.*, *Vivas*, 392 Ill. App. 3d at 660 (in an action by Peruvian plaintiffs against the Boeing corporation in Illinois, the court took into consideration that both parties had employed attorneys with offices in Cook County to deny the defendant's motion to dismiss the case and transfer venue).

### B. Public Interest Factors

We next turn to the public interest factors: (1) the interest in deciding controversies locally and (2) the unfairness of imposing trial expense and the burden of jury duty on residents of a forum that has little connection to the litigation; and (3) the relative docket congestion of the two suggested forums. *Langenhorst*, 219 Ill. 2d at 443. With respect to the first two factors, Motorola contends that the trial court abused its discretion when it found that Illinois had an interest in deciding this controversy. Motorola contends that Illinois has no connection to this litigation because neither the plaintiffs nor the situs of their injuries is in Illinois. Motorola further argues that a jury trial is an expense to the public and that Illinois taxpayers should not be obligated to pay for litigation which is unrelated to Illinois; nor should Illinois courts be burdened with applying the law of other states to resolve such controversies in Illinois. We disagree.

Contrary to Motorola's contentions, the record suggests that this is not a local Texas controversy. First, as already explained above, the witnesses in this case are scattered throughout the United States. The plaintiffs were injured in two different states, and direct evidence of what transpired in the "clean rooms" where they were allegedly exposed to the hazardous chemicals is

equally likely to be located in Arizona as well as Texas. See *Vivas*, 392 Ill. App. 3d at 659 (noting that it was not an abuse of discretion to conclude that where "witnesses *** [are] scattered among different states and countries," this factor did not tilt in favor of any one forum); *Woodward*, 368 Ill. App. 3d at 834 (where potential witnesses are "scattered among different forums," no one forum can be said to be more convenient); *Ellis*, 357 Ill. App. 3d at 747 (same); *Guerine*, 198 Ill. 2d at 526.

More importantly, the record reveals that Illinois has a direct interest in deciding this controversy. Apart from the obvious, *i.e.*, the fact that Motorola maintains its corporate headquarters and other facilities in Schaumburg, Illinois, and that numerous witnesses, who are expected to testify at trial, such as the various members of Motorola's steering and executive committees, reside in Illinois, the record reveals that in the 1990s (when the plaintiffs allege they were injured in Motorola's "clean rooms" in Texas and Arizona), Motorola also owned and operated several semiconductor manufacturing "clean room" facilities in the state of Illinois. Motorola's director of environmental health and safety, Loch, testified in his discovery deposition that in the time period relevant to the present litigation, Motorola owned and operated two "clean rooms" in Illinois, one in Northbrook and one in Schaumburg. This statement was corroborated by Motorola's answer to the plaintiffs' interrogatories wherein Motorola admitted that between 1992 and 1995 it owned and operated several facilities throughout the country that contained "clean rooms," including: three facilities in Schaumburg, Illinois, one facility in Northbrook, Illinois, and one facility in Arlington Heights, Illinois. Under these circumstances, we cannot conclude that Illinois has no interest in litigating a controversy that has had an impact on its own

citizens.

Motorola nevertheless contends that transfer to Texas is proper because if this case were to proceed in Cook County, the trial court would be saddled with applying Texas and Arizona law. Motorola specifically asserts that the trial court below properly found that Illinois substantive law would not apply to the plaintiffs' claims, but that it then inexplicably weighed this factor in favor of the plaintiffs. We disagree.

Contrary to Motorola's assertion, the trial court never decided the choice of law issue. In fact, the trial court specifically stated that a choice of law motion was not currently before it, and that it would not decide this issue for purposes of the *forum non conveniens* motion. However, the trial court then went on to state that assuming *arguendo* it would have to apply foreign laws, this factor alone would not weigh in favor of either party, since wherever the case were tried, in Illinois, or Texas, both the "Illinois and the Texas courts would also have to apply the foreign laws of Arizona." We find no abuse of discretion in this finding. See, *e.g.*, *Ferguson*, 302 Ill. App. 3d at 74-75 ("Even assuming the application of New York law to the instant controversy, however, that factor would not weigh in favor of dismissal of the Illinois action. Illinois courts can readily adapt to apply foreign laws to actions pending before them. [Citation.]"); see also *Simantz v. Prime Motor Inns, Inc.*, 213 Ill. App. 3d 813, 816 (1991) (finding that Illinois court could apply Arizona law in a common law negligence action); *Grant v. Starck*, 96 Ill. App. 3d 297, 304 (1981) (choice-of-law considerations cannot be deemed dispositive, in light of other relevant connections the litigation may have with the forum); *Woodward*, 368 Ill. App. 3d at 837 (holding that the application of Australian law by an Illinois court would not be a dispositive factor in a

33

*forum non conveniens* analysis because "[a]n Illinois court is competent to determine which law applies to this controversy and to apply the law of Australia, if necessary"); see also *In re Bridgestone/Firestone, Inc.*, 190 F. Supp. 2d 1125, 1148 (S.D. Ind. 2002) (courts must guard against an excessive reluctance to undertake the task of deciding foreign law).

Turning to the third public interest factor, *i.e.*, the comparative congestion of the respective courts, we initially recognize that Motorola is correct that Cook County's docket is congested. Motorola provided the circuit court with copies of the annual 2007 docket statistics for Illinois and Texas, revealing that in 2007, Cook County disposed of about 1.8 million cases, while Travis County, Texas, disposed of only about 50,000 cases. Nevertheless, our supreme court has repeatedly held that "[t]he court congestion factor, by itself, is relatively insignificant [citations] and is not sufficient to justify transfer of venue when none of the other relevant factors weigh strongly in favor of transfer." *Dawdy*, 207 Ill. 2d at 181 (citing *Guerine*, 198 Ill.2d at 517, and *Griffith*, 136 Ill. 2d at 114); see also *Langenhorst*, 219 Ill. 2d at 451 ("[w]hen deciding *forum non conveniens* issues, the trial court is in the better position to assess the burdens on its own docket"); *Brummett v. Wepfer Marine, Inc.*, 111 Ill. 2d 495, 503 (1986) (courts are extremely reluctant to remove cases because of crowded dockets). As all of the other public interest factors do not "strongly favor" dismissal of the action, we find that court congestion alone is not dispositive of the forum issue in this case.

Lastly, we reject Motorola's assertion that *Jones v. Searle Laboratories*, 93 Ill. 2d 366 (1982) is dispositive because "each case must be decided based on a case-by-case consideration of convenience and fairness." *Cradle Society*, 389 Ill. App. 3d at 79 (citing *Gridley*, 217 Ill. 2d at

168).

In conclusion, and after evaluating the record below, we find that the trial court carefully balanced all of the private and public interest factors relevant in a *forum non conveniens* analysis, so as to compel us to find that it did not abuse its considerable discretion in denying Motorola's motion to dismiss. See *Vivas*, 392 Ill. App. 3d at 657 ("[t]he issue *** is not what decision [the reviewing court] would have reached if [it] were reviewing the facts on a clean slate, but whether the trial court acted in a way that no reasonable person would"); see also *Jones*, 93 Ill. 2d at 378 (noting that although it was "conceivable that [on the facts of that case] a different result could have been reached," "the question [was] not whether a reviewing court would have weighed the factors differently or would have resolved the issue as did the trial court" but, rather, whether the trial court's decision constituted an abuse of discretion); see also *Langenhorst*, 219 Ill. 2d at 433; *Woodward*, 368 Ill. App. 3d at 837-38; see also *Ellis*, 357 Ill. App.3d at 748.

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.